Mark Ogden (AZ Bar No. 017018)
mogden@littler.com
LITTLER MENDELSON, P.C.
A Professional Corporation
Camelback Esplanade
2425 East Camelback Road
Suite 900
Phoenix, AZ  85016
Telephone:   602.474.3600
Facsimile:   602.957.1801

Attorneys for Plaintiff
UNITEDHEALTH GROUP INCORPORATED

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| UnitedHealth Group Incorporated, a Minnesota corporation, | Case No. |
| Plaintiff, | |
| v. | **COMPLAINT AND REQUEST FOR INJUNCTIVE RELIEF** |
| Michael Tilton and Trisha Tilton, husband and wife, | |
| Defendants. | |

Plaintiff UnitedHealth Group Incorporated ("UHG"), in support of its Complaint against defendants Michael Tilton ("Tilton") and Trisha Tilton and Request for Injunctive Relief, alleges and states as follows:

## INTRODUCTION

1.     This civil action seeks, among other relief, to prevent the immediate and irreparable harm that Tilton has caused and continues to cause UHG by breaching his restrictive covenants, disclosing its confidential information, misappropriating UHG trade secrets, and soliciting brokers with whom UHG has a relationship.

LITTLER MENDELSON, P.C.
A PROFESSIONAL CORPORATION
Camelback Esplanade
2425 East Camelback Road
Suite 900
Phoenix, AZ  85016
602.474.3600

**THE PARTIES**

2. UHG is a business corporation organized pursuant to the laws of the state of Minnesota, with its principal place of business located in Minnetonka, Minnesota.

3. Michael Tilton is a former UHG employee, and at all times material hereto has been, a citizen of and is domiciled in Arizona.

4. Trisha Tilton is Tilton's spouse, and at all times material hereto has been a citizen of and is domiciled in Arizona. Trisha Tilton shares an interest in the outcome of this litigation because Arizona is a community property state and any liability that may attach as a result of this litigation would be enforceable against the common property of Michael and Trisha Tilton.

**JURISDICTION AND VENUE**

5. This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), because the matter in controversy, exclusive of interest and costs, exceeds $75,000.00 and involves citizens of different states.

6. This Court has personal jurisdiction over Tilton and Trisha Tilton, who have committed acts and caused events to occur in the State of Arizona which are the foundation of this action and out of which this action arises. Tilton has accepted a job with Aetna Inc. located in Arizona and threatens to continue to violate his obligations and duties owed to UHG in this district. Tilton and Trisha Tilton reside within the geographic jurisdiction of this Court and therefore, venue is proper in this Court.

**FACTUAL BACKGROUND**

7. UHG is organized into six market-focused businesses, including UnitedHealthcare, Employer & Individual, which offers consumer-oriented health benefit plans and services to the public sector, employers and individuals, and educational institutions throughout the nation. UHG is headquartered in Minnetonka, Minnesota, and employs approximately 90,000 employees nationwide. UHG's human resources, payroll and benefits departments for its employees nationwide are primarily based at its headquarters. UHG employees are able to direct any questions they have regarding UHG's employee

LITTLER MENDELSON, P.C.
A PROFESSIONAL CORPORATION
Camelback Esplanade
2425 East Camelback Road
Suite 900
Phoenix, AZ 85016
602.474.3600

-2-

policies and procedures as well as payroll and UHG benefits and stock options to representatives at UHG's headquarters.

### Tilton's Employment at UHG

8.     UHG hired Michael Tilton ("Tilton") on July 16, 2007, as Vice President, Sales and Account Management, Key Accounts.  In that role, Tilton supervised a team of approximately 30 Sales, Account Management and Support staff.  Along with his team, Tilton was responsible for broker and direct sales to customers employing 100 to 3,000+ employees in Arizona, which included increasing sales of new self-insured and fully-insured customers and the retention of existing accounts.  During the first two years of his employment, Tilton had been responsible for the Arizona and Utah markets.  Throughout his employment, Tilton created strong relationships with customers and brokers, possessed significant knowledge regarding UHG's products, services, recruiting strategies, distribution channels, payment structures, underwriting practices and principles, and communicated UHG's products and services to the marketplace.

9.     As part of his compensation as the Vice President, Sales and Account Management, Key Accounts, Tilton received UHG's Stock Appreciation Rights Awards (Stock Settled) ("SARA") and Restricted Stock Unit Awards ("RSUA") (collectively, "Equity Grants").  Throughout his employment, UHG granted Tilton the following Awards:

| Award | Award Date |
| --- | --- |
| Stock Appreciation Rights Award (7,200 shares) | July 30, 2007 |
| Restricted Stock Unit Award (304 units) | June 5, 2008 |
| Stock Appreciation Rights Award (566 shares) | June 5, 2008 |
| Restricted Stock Unit Award (385 units) | February 3, 2009 |
| Stock Appreciation Rights Award (566 shares) | February 3, 2009 |
| Restricted Stock Unit Award (152 units) | February 9, 2010 |
| Stock Appreciation Rights Award (381 shares) | February 9, 2010 |
| Restricted Stock Unit Award (595 units) | February 9, 2011 |

Attached hereto as Exhibits A-H are true and correct copies of Tilton's Equity Grants.

LITTLER MENDELSON, P.C.
A PROFESSIONAL CORPORATION
Camelback Esplanade
2425 East Camelback Road
Suite 900
Phoenix, AZ  85016
602.474.3600

-3-

10.    The Equity Grants are offered to only approximately 10 percent of UHG employees.  As part of the Equity Grants, Tilton agreed to abide by certain post-employment contractual obligations.   Tilton acknowledged and agreed to certain restrictive covenants, which generally forbid Tilton from engaging in four separate activities following the end of his employment at UHG:  (1) disclosing confidential information (indefinite); (2) soliciting business from UHG customers, providers or prospective customers or providers (two years); (3) soliciting or hiring UHG employees (two years); or (4) engaging in any activity which competes with UHG products or services (one year).

11.    Tilton electronically executed an acknowledgement of each one of these Equity Grants, thereby consenting to the Restrictive Covenants contained therein.  By accepting the Equity Grants, Tilton also agreed that the provisions of the Restrictive Covenants were reasonable and necessary to protect the legitimate interests of UHG.[1]  *See* Exhs. A-H, last paragraph of Restrictive Covenants provision in RSUAs and the SARAs.

12.    UHG has invested considerable efforts and resources to develop and maintain the secrecy of its "Confidential Information," which Tilton used on a daily basis and regularly received throughout his employment.  UHG takes specific measures to preserve the confidentiality of its confidential and proprietary information, including, but not limited to: (a) including non-disclosure covenants in Equity Grants awarded to employees; (b) restricting access to such certain Confidential Information, computer networks and computers through the use of log-ons, passwords and encryptions; (c) restricting access to executives who "need to know" such information; (d) maintaining firewalls that prevent employees from forwarding certain Confidential Information beyond UHG's computer

---

[1] The language of the Restrictive Covenants contained in Tilton's RSUAs and SARAs is practically identical.  Furthermore, the February 9, 2010 SARA states that "to the extent [Tilton] and UHG agree at any time to enter into separate agreements containing restrictive covenants with different or inconsistent terms than those contained herein, [Tilton] and [UHG] acknowledge and agree that such different or inconsistent terms shall not in any way affect or have relevance to the Restrictive Covenants contained herein."  *See* Exh. G at Section 10(e).

LITTLER MENDELSON, P.C.
A Professional Corporation
Camelback Esplanade
2425 East Camelback Road
Suite 900
Phoenix, AZ  85016
602.474.3600

-4-

1   networks; and (e) disconnecting employee passwords upon an employee's separation and

2   obtaining any and all Confidential Information in the employee's possession.

3        13.    UHG's confidential and proprietary information is not generally available to

4   the public, is of great value to UHG, and it would give UHG's competitors who acquired

5   such information an unfair competitive advantage in the marketplace.  During his role as

6   Vice President, Sales and Account Management, Key Accounts, UHG provided Tilton

7   access to its Confidential Information and trade secrets, for his market, his region and

8   nationally.  The protections accorded to UHG in the Equity Grants are essential to UHG's

9   ability to successfully conduct its business.   Absent those protections, former UHG

10  employees – like Tilton – would be able to misappropriate UHG's confidential and

11  proprietary information, and compete unfairly with UHG, thereby irreparably damaging

12  UHG.

13       14.    For example, Section 10(a) of Tilton's February 9, 2010 SARA requires Tilton

14  to refrain from disclosing UHG's "Confidential Information," which includes "inventions,

15  new product or marketing plans, business strategies and plans, mergers and acquisition

16  targets, financial and pricing information [...], models and data bases, analytical models,

17  customer lists and information, and supplier and vendor lists and information."   Tilton

18  agreed "not to disclose or use Confidential Information, either during or after [his]

19  employment with [UHG], except as necessary to perform [his] duties."  Attached as Exhibit

20  G is a true and correct copy of Tilton's February 9, 2010 SARA.

21       15.    Section 10(c) of the SARA states:

22         Non-Competition.  During [Tilton's] employment and for the greater of one
23         year after the termination of [Tilton's] employment for any reason whatsoever
           or the time period during [] which the Stock Appreciation Rights remain
24         exercisable, [Tilton] may not, without [UHG's] prior written consent, directly
           or indirect, for [Tilton] or for any other person or entity, as agent, employee,
25         officer, director, consultant, owner, principal, partner or shareholder, or in any
26         other individual or representative capacity:

27              (i)    Engage in or participate in any activity that competes, directly or
28                     indirectly, with any [UHG] product or service that [Tilton]

LITTLER MENDELSON, P.C.
A PROFESSIONAL CORPORATION
Camelback Esplanade
2425 East Camelback Road
Suite 900
Phoenix, AZ 85016
602.474.3600

-5-

engaged in, participated in, or had Confidential Information about during [his] employment.

    (ii)    Assist anyone in any of the activities listed above.  *Id.*

16.    In addition, Section 10(b) of the SARA states:

<u>Non-Solicitation</u>.  During [Tilton's] employment and for the greater of two years after the termination of [Tilton's] employment for any reason whatsoever or the period of time during which the Stock Appreciation Rights remain exercisable, [Tilton] may not, without [UHG's] prior written consent, directly or indirectly, for [his] or for any other person or entity, as agent, employee, officer, director, consultant, owner, principal, partner or shareholder, or in any other individual or representative capacity:

    (i)    Solicit any business competitive with [UHG] from any person or entity who (a) was a Company provider or customer within the 12 months before [Tilton's] employment termination and with whom [he] had contact to further [UHG's] business, or for whom [Tilton] provided services or supervised employees who provided those services, or (b) was a prospective provider or customer [UHG] solicited within the 12 months before [Tilton's] employment termination and with whom Participant had contact for the purposes of soliciting the person or entity to become a provider or customer of [UHG], or supervised employees who had those contacts.

    (ii)    Hire, employ, recruit or solicit any [UHG] employee or consultant.

    (iii)    Induce or influence any [UHG] employee, consultant, or provider to terminate his, her or its employment or other relationship with [UHG].

    (iv)    Assist anyone in any of the activities listed above.  *Id.*

17.    In addition, Tilton acknowledged that because UHG's business competes on a nationwide basis, his obligations under the "Restrictive Covenants" section of the Equity Grants would apply on a nationwide basis.  *Id.* at Section 10(d).

18.    The SARA further states that if Tilton violates any provision of the Restrictive Covenants, forfeiture of any unvested and certain vested Stock Appreciation Rights would occur.  *Id.* at Section 9(a).  In addition, Tilton acknowledged and agreed that "(i) legal

LITTLER MENDELSON, P.C.
A PROFESSIONAL CORPORATION
Camelback Esplanade
2425 East Camelback Road
Suite 900
Phoenix, AZ  85016
602.474.3600

-6-

1   remedies (money damages) for any breach of the Restrictive Covenants in Section 10 will be

2   inadequate, (ii) [UHG] will suffer immediate and irreparable harm for such breach; and

3   (iii) [UHG] will be entitled to injunctive relief." *Id.* at Section 13(f); *see also*, Section 7(b).

4        19.   Tilton's SARA identifies a Minnesota choice of law. *Id.* at Section 13(h).

5        **Tilton's Use of UHG's Confidential Information**

6        20.   During his employment, UHG expended substantial time, resources and effort

7   in developing and supporting Tilton in his role as Vice President, Sales and Account

8   Management, Key Accounts.  UHG placed Tilton in direct contact with its customers and

9   brokers, and confided its confidential and proprietary data, facts, business knowledge and

10   information to him.  As a result, Tilton developed intimate insider knowledge of UHG's

11   customers, brokerage relationships, financing, and strategic business objectives and plans.  In

12   many instances, Tilton was the primary UHG contact with certain customers, brokers and

13   consultants in his book of business.

14        21.   Tilton's position as Vice President, Sales and Account Management, Key

15   Accounts, gave him substantial access to certain confidential and proprietary business

16   information developed and maintained by UHG.  UHG selects a small number of high-

17   ranking executives, such as Tilton, to receive frequent reports and attend meetings pertaining

18   to all key areas of UHG's business strategies.  These confidential and sensitive reports

19   provide, in the greatest detail, UHG's strategic and development information.  As a result of

20   these meetings and other related communications, Tilton learned strategic information, goals

21   and potential acquisitions of UHG.  With respect to UHG's acquisitions, Tilton had full

22   access to confidential and proprietary information regarding the identity of specific partners

23   UHG intends to acquire in the near future along with payment information and UHG's

24   underlying reasons for the acquisition.

25        22.   UHG has also spent significant time and resources exploring a multi-channel

26   distribution strategy, such as the development of a strong presence in the virtual world.

27   Virtual consumers expect insurers to communicate and provide services to them online.  This

28   has created the need for insurers to integrate traditional operations with the virtual world.  To

LITTLER MENDELSON, P.C.
A PROFESSIONAL CORPORATION
Camelback Esplanade
2425 East Camelback Road
Suite 900
Phoenix, AZ 85016
602.474.3600

-7-

market to and accommodate those consumers who access the web on their mobile devices, UHG has developed various consumer applications. Tilton has been privy to UHG's development of mobile-based applications as well as UHG's product launches and specific launch dates. UHG's product innovation team shared confidential business information regarding UHG's consumer applications with UHG's national leadership in October 2011, which in turn was shared only with the leadership team of Jeri L. Jones ("Jones), the Chief Executive Officer for Arizona, Utah and Idaho Markets of UnitedHealthcare, Employer & Individual, which included Tilton. The leadership team had been instructed not to further distribute the information. UHG's confidential business information is not generally available to the public, is of great value to UHG and would give any of its competitors which acquired such information an unfair competitive advantage. As stated above, UHG takes specific measures to preserve the confidentiality of its confidential and proprietary information.

23. Based upon his involvement in working with brokers and directly with UHG customers and his participation in high-level strategic meetings regarding broker distribution strategies, Tilton acquired considerable confidential and sensitive UHG information. The contract rates, price points and profit margins in the agreements between UHG and its brokers and customers are determined following significant in-depth market analysis. The details of the relationships are confidential and they are not disclosed to UHG's competitors. If this information were conveyed to a UHG competitor, that competitor could meticulously and narrowly underbid UHG, depriving UHG of its relationships with certain brokers and customers, ultimately resulting in compromised revenue.

24. More recently, Tilton and other high-level and senior-level executives focused their efforts toward creating and developing ideas that will allow UHG to succeed in a pre- and post-health care reform environment. Federal health care reform has created a completely changed landscape for health insurers, as the law contemplates much broader health coverage with significant uncertainty about how that coverage will be paid for. There are new and dramatically different regulations about financial accounting, underwriting and

LITTLER MENDELSON, P.C.
A Professional Corporation
Camelback Esplanade
2425 East Camelback Road
Suite 900
Phoenix, AZ 85016
602.474.3600

-8-

pricing, and health insurers' ability to adapt to this changed environment will be critical to their ability to succeed in the market.  At UHG, this has resulted in strategic thinking about which opportunities and challenges have been and will be posed by health care reform, and the business strategies UHG should put in place to succeed.  Specifically, UHG depends on its relationships with third-party brokers who work with UHG customers in the selection and handling of benefits plans.  As key elements of health care reform become effective over the next several years, customers are likely to turn to brokers to guide them through the changes and plan ahead to deal with new responsibilities.  However, health care reform is requiring a larger percentage of each dollar to be spent directly on health care, rather than insurance underwriting and administration.  The Patient Protection and Affordable Care Act requires insurance companies to spend 80 percent of small group and individual policyholders' premiums on medical care and large group insurers must put 85 percent on medical care.  Administrative costs include commissions paid to brokers and consultants that can make up on average 4 to 5 percent of premiums.  Thus, commissions paid to brokers will have to be paid in some other way, if at all.

25.     With the impact of health care reform, insurers have been reevaluating their distribution strategies.  In or around November 2010, Aetna was the first major carrier to announce its decision to transform broker payment from commission-based to a service fee in order to comply with health care reform.  This decision resulted in a negative response from customers and a loss of business to Aetna.  Therefore, Aetna withdrew its direction on a national level and may still be struggling with what direction to take with this challenge in its state and local markets.  While every insurance company is faced with this dilemma, companies have been forced to develop individual and geographical strategies.

26.     In this regard, Tilton was privy to UHG's reevaluation of its distribution strategies nationwide and how UHG intends to navigate through various compliance priorities.  Tilton performed work related to UHG's compliance with the legal and regulatory framework of the health care reform from the perspective of how UHG will pay brokers in the Arizona and Colorado markets.  Beginning in 2010, Tilton attended high-level meetings

LITTLER MENDELSON, P.C.
A PROFESSIONAL CORPORATION
Camelback Esplanade
2425 East Camelback Road
Suite 900
Phoenix, AZ  85016
602.474.3600

-9-

and received detailed, highly confidential information related to UHG's distribution strategies on a nationwide basis.  In the summer of 2011, UHG's regional leadership and every Vice President of Sales obtained a report concerning distribution plans for UHG's customers in every state.  Each Vice President of Sales, such as Tilton, was responsible for deciding what changes, if any, would be made in the next few years regarding the payment of broker commissions.

27.    To make these decisions, in the fall of 2011, UHG's Regional Vice President of Sales distributed to the Vice Presidents of Sales, including Tilton, a highly confidential document, entitled "National Rollup," containing relevant information regarding the new accounting challenges and a list of all UHG customers in every market at risk as a result of health care reform.  The document also included the type of plan, identity of the broker, number of plan members, probability of retention and reasons for the risk.  Prior to health care reform, a carrier accounted for the revenue and loss based on the location of the customer's broker regardless of where the customer's plan is located.  For instance, UHG may have a plan in place for a customer in Arizona, while the broker managing the plan on behalf of the customer is located in Texas.  Carriers must now account for their financials based on the situs of the customer, which will include the compensation to brokers who are located elsewhere.  Tilton received  a report containing information regarding all multi-based plans in every UHG market.  UHG has made significant efforts, along with a considerable investment of time and money, to develop unique and proprietary distribution strategies and other models to account for the changing landscape of health care, which it considers and treats as highly confidential.

28.    Tilton also worked with UHG's government relations division, which handles regulatory functions, in the development of UHG's Rewards Now product.  In the last 18 months, UHG had explored the production of a product to fill in the gap between UHG's self–funded and fully-insured products.[2]  Generally, this is known as a "minimum premium

---

[2] By way of background, fully-insured products are prepaid by the customer to the carrier on a monthly basis in advance of any submitted claims, while consumers who purchase self-

LITTLER MENDELSON, P.C.
A PROFESSIONAL CORPORATION
Camelback Esplanade
2425 East Camelback Road
Suite 900
Phoenix, AZ  85016
602.474.3600

-10-

product," which is a hybrid between a self-funded and fully-insured product.  Tilton and his team worked with the underwriting team, local product team and the regional product lead to define and structure this product.  Tilton also worked with the regulatory team to ensure the product's approval in the state of Arizona, and UHG has been offering the Rewards Now product to its customers since January 2011.  While other competitors offer types of minimum premium products, Aetna does not actively market any such product in Arizona at this time.  Knowledge of UHG's development, research and risks related to the Rewards Now product would allow competitors to create or revise a similar product that is more competitive.

29.    Every month for the last few months, and every Friday for the year and a quarter before that, UHG's national regulatory team  offered webcasts to educate certain UHG employees on health care reform.  The team distributes confidential information to participants which are often the subject of weekly meetings that Tilton attended.  This information allowed Tilton and his team to identify gaps in which to compete in the marketplace.  Differences in premiums and the structure of customers' risk distinguish UHG from competitors.

30.    Almost every quarter during his employment, Tilton prepared and participated in the Market Review for the Arizona and Utah markets where financial reports, budgets, gross sales, premiums, and medical expenses are reviewed with the regional leadership of UHG.  Each meeting takes at least a few hours, during which the Regional Team reviews the information and provides its recommendations.  Tilton and his team were responsible for preparing information for the Regional Team's review related to the sales and products.  Confidential information regarding the markets' business, including but not limited to sales, network, clinical, underwriting, actuary, pricing strategies, products, and financials, are

---

funded products pay a fee to the carrier for administrative services, which the carrier provides, in part, through the payment of claims on behalf of the customer as the claims are processed.

LITTLER MENDELSON, P.C.
A PROFESSIONAL CORPORATION
Camelback Esplanade
2425 East Camelback Road
Suite 900
Phoenix, AZ  85016
602.474.3600

-11-

discussed and distributed at the meeting.   The markets within the region often shared information regarding best practices.

31.     Throughout his employment at UHG, Tilton developed a relationship with over 1000 cases or customers, including CEOs, benefits leaders and brokers throughout the industry.   On a weekly basis, Tilton participated on a pipeline call with UHG's underwriting team, sales account executives, and Jones, to discuss various sales opportunities UHG is targeting.   Tilton obtained knowledge on the financial viability of markets located in Arizona and Utah markets as well as UHG's corresponding budget.   Specifically, the participants discussed UHG's key prospects, such as the top cases or customers at that time period to whom they had an opportunity to sell.

32.     UHG's underwriters priced cases at certain levels and worked with Tilton and his team to offer the best product for the customers.   Tilton worked closely with Phil Johnson, UHG's Director of Underwriting, and Johnson's team.   Johnson, who is located in Minnesota, along with the majority of UHG's underwriters, worked with Tilton on the sale of a number of cases, discussing the products and customer risks.   The underwriting team communicated with Tilton approximately three days each week.   Information developed by the underwriting team on a monthly basis, which often included a summary of UHG's status compared to its forecast, its book of business, and premium trends, was shared with Tilton and his team.

**UHG's Substantial Investment In Tilton, And Tilton's Exposure To Confidential Information**

33.     Throughout his employment, Tilton had been provided performance reviews to discuss Tilton's goals, successes and areas of improvement.   Performance appraisals are provided to UHG employees each year to determine the quality of work for the past year as well as the suitability for retention, promotion or further training. UHG believed that Tilton had a strong and bright future and would be eventually positioned to assume national responsibilities.   Before acquiring such a role, UHG invites select high-level executives to participate in Conferences and Programs to develop these individuals for leadership

LITTLER MENDELSON, P.C.
A PROFESSIONAL CORPORATION
Camelback Esplanade
2425 East Camelback Road
Suite 900
Phoenix, AZ 85016
602.474.3600

-12-

positions, and provides them with a bigger picture of UHG's business and strategies and to introduce them to UHG's senior-level executives.

34.    In 2010, Tilton had been selected to participate in UHG's Executive Leadership Development Program where approximately 30 UHG employees are in attendance.  For nine days, participants travel to North Carolina, Minnesota, and the Wharton School in Pennsylvania.    Tilton had the opportunity to meet with UHG and UnitedHealthcare's senior-level executives, including Gail Boudreaux, Chief Executive Officer of UnitedHealthcare, and other high-level sponsors within UHG.  These top tier executives set aside time to interact and mentor individuals such as Tilton.  During the Program, the participants are broken into six different teams and each team works with an executive level sponsor, many of whom are located in Minnesota, on a project or pilot involving a real world business problem for UHG.  Tilton had access to UHG's confidential information and trade secrets necessary for his particular project.  UHG utilizes the teams' data and conclusions to determine whether the particular project or pilot will be successful for the company.

35.    As a prerequisite to progression to an executive leadership position at UHG, participation in the General Manager Program is required.  Many of the same senior-level executives also attend this Program.  In 2011, this Program took place in Nevada, New York, and Minnesota.  Tilton, along with *only 20 other UHG executives*, attended the first two sessions of the Program, but resigned before attending the Program in Minnesota.  Again, only a select number of UHG executives are invited to participate in the Program.  In Nevada, Tilton obtained confidential business information on UHG's strategic planning such as UHG's integrated health care system model, the coordinated services of UHG's health plan and UHG physicians, and toured a facility where the model is currently in place.  This system is not currently in place in Arizona.

36.    In addition, UHG held a Sales Leadership Conference for its sales Vice Presidents in the West and Central Region.  In March 2011, Tilton attended a day and a half the Sales Leadership Conference in Nevada, and allowed Tilton to network with other Vice

LITTLER MENDELSON, P.C.
A PROFESSIONAL CORPORATION
Camelback Esplanade
2425 East Camelback Road
Suite 900
Phoenix, AZ  85016
602.474.3600

-13-

Presidents and learn best practices.  The primary focus of the Conference was to provide information to the Vice Presidents to share with their teams regarding sales skills, UHG's future product changes, as well as UHG's medical management, marketing, and health care exchange[3] strategies.  The Regional Vice President for Sales and Account Management for the West Region maintained the information presented at the Conference on a shared drive accessible to the participants.  At the Conference, UHG discussed its relationship with a pharmacy management company called Medco.  In the last four to five years, UHG acquired PacifiCare and its in-house pharmacy management business Prescription Solutions.  UHG had split its business between Prescription Solutions and Medco, but has decided to cancel its contract with Medco and provide in-house services only.  Most of UHG's competitors continue to contract with a separate entity, such as Medco, for pharmacy management.  At the Sales Leadership Conference, Tilton obtained confidential information regarding UHG's strategies to offer Prescription Solutions' services to customers.

37.     Additionally, the Arizona Off-Site Leadership Meeting took place on November 2, 2011, which included the Tilton, Jones, the network leader, medical director, small business Vice President, CFO and government relations, and leader of the Utah market.  The meeting included discussions regarding UHG's specific strategies for the next three years regarding the growth of UHG's traditional business, expansion of alternative sources of revenue and pricing and trend accuracy.  Tilton had attended this type of meeting annually during his employment.   Detailed information concerning UHG's network strategies and contracting approaches (including its value-based network strategy), payment models, and delivery system strategies had been distributed to those who attended the Meeting.   In addition, the Meeting involved discussion of UHG's Accountable Care Organization pilot partnerships in Arizona, New York, and Illinois as well as UHG's pilot activity across the nation.   During the meeting, we distributed documents containing

---

[3] A key element of health care reform is the creation by each state of a health insurance "exchange" or competitive marketplace, where individuals not covered through their employers can purchase health insurance.

LITTLER MENDELSON, P.C.
A Professional Corporation
Camelback Esplanade
2425 East Camelback Road
Suite 900
Phoenix, AZ  85016
602.474.3600

-14-

1   confidential and proprietary information related to UHG's national strategies for the next

2   three years, products and services in development, and areas of new opportunities.  These

3   documents had been created for UHG's Employer & Individual Leadership Conference that

4   only UHG's senior-level executives attend.

5       38.    In the last two years, Tilton has traveled to Minnesota on nine separate

6   occasions for business-related purposes.

7                    **Tilton's Resignation from UHG to Join Aetna Inc.**

8       39.    On November 11, 2011, Tilton tendered his resignation to UHG.  At the time

9   of his resignation, Tilton earned $360,232.00/year, exclusive of benefits and the Equity

10  Grants described above.   Tilton stated his intention to join Aetna Inc. as the General

11  Manager and President, Mountain Region, on or about November 28, 2011.  In this position,

12  Tilton will be the senior executive responsible for Aetna's operations located in Arizona,

13  Colorado, Nevada, New Mexico, and Utah.   Tilton's last day worked with UHG was

14  November 11, 2011.  UHG asked him to vacate the facility and return his UHG property that

15  day.  Tilton's last day of formal employment with UHG was November 28, 2011, and UHG

16  maintained Tilton on the payroll until that date.  Tilton plans to begin work for Aetna prior to

17  December 8, 2011.

18      40.    It will take at least one year before UHG can find a replacement for Tilton and

19  before the new Vice President, Sales and Account Management, Key Accounts, can show to

20  UHG that he or she can do the job effectively.

21      41.    Aetna is a large, national, direct competitor of UHG.  According to Aetna's

22  self-reported commercial membership information in the Mountain Region, Aetna appears to

23  cover a similar number of members as UHG covers in Arizona and Colorado.  Moreover, in

24  performing the position of General Manager and President, Mountain Region, it seems

25  impossible that Tilton could perform his duties and responsibilities without using and/or

26  disclosing UHG's confidential and proprietary information, since it seems impossible for

27  someone in that position to forget all of the sensitive, confidential UHG information.

28  Tilton's misappropriation of UHG's confidential and proprietary information and continued

LITTLER MENDELSON, P.C.
A Professional Corporation
Camelback Esplanade
2425 East Camelback Road
Suite 900
Phoenix, AZ  85016
602.474.3600

-15-

violation of his obligations under the Restrictive Covenants in his Equity Grants inevitable. UHG has informed Aetna of Tilton's Restrictive Covenants, and believes that Aetna offered Tilton a position, which Tilton accepted, while Tilton was still employed by UHG.

42.    After receiving notice of his resignation, UHG obtained the UHG laptop computer Tilton used during his employment.  A UHG Corporate Security Investigator discovered that *only three days before resigning,* Tilton had copied close to 1000 files stored on his laptop, which included copies of UHG's 2012 regional budget outlining the strategies for every market in the West region, financial dashboards, the 2011 business plan for Tilton's team, 2010 Market Review, West Region 2011-2012 Membership Growth, Reform Market Impact Assessment, pricing information, as well as numerous templates used by UHG.  Tilton copied specific regional information regarding how UHG is trending, its development planning, current products, pricing, and strategies related to medical management to reduce costs.  Tilton also copied information regarding numerous UHG customers.

43.    Using UHG's confidential and proprietary information learned from Tilton, Aetna could successfully establish similar strategies and products without having to undertake any of the efforts or investments that UHG did.  Aetna could exploit the work performed and resources expended by UHG.  For example, armed with UHG's highly confidential and proprietary information, Aetna would know precisely what UHG is paying to certain brokers, charging certain and customers, and could unfairly compete with respect to those payments or products.  The information Tilton has gathered throughout his employment and the documents copied by Tilton provide him – and Aetna – with a playbook of how to compete with UHG.

44.    As detailed above, Tilton had been privy to much more than just UHG's confidential information regarding sales in Arizona.  For example, Tilton's job entailed his working with the clinical side of UHG's business, which manages the delivery of medical care.  Tilton worked directly with UHG's care management models, including but not limited to UHG's analysis of "bed days," which requires UHG to analyze levels and

LITTLER MENDELSON, P.C.
A PROFESSIONAL CORPORATION
Camelback Esplanade
2425 East Camelback Road
Suite 900
Phoenix, AZ 85016
602.474.3600

-16-

strategies to reduce unnecessary patient costs, and was privy to this information.  UHG's Market Reviews also included detailed discussions with the clinical team regarding UHG's targets and health care costs.  Along with UHG's network leader and her team, Tilton participated in discussions regarding UHG's pricing and network discounts offered to physicians and hospitals and attended meetings with customers regarding UHG's negotiations with hospitals.  The contracts that result from these negotiations have a direct and substantial effect on health care costs and premiums.  Tilton's sales-related duties made him a necessary part of UHG's network strategies, which ultimately dictated what Tilton sold.  Among the documents Tilton downloaded were UHG's network contracts.  This information would be of tremendous competitive value if Tilton were allowed to assume the role he has accepted at Aetna, since he would be in charge of their network operations.

45.   Moreover, business involving large commercial accounts is generally concentrated among a relatively small number of national and regional brokerages.  UHG understands the importance of investing resources and maintaining relationships with those brokerages.  Tilton was responsible for maintaining UHG's relationship with Lovitt & Touche.  Lovitt & Touche does not currently do business with Aetna.  The loss of the Lovitt & Touche relationship would cause UHG a significant loss of business.

46.   Tilton has already made efforts to develop a relationship between Aetna and Lovitt & Touche.  Prior to Tilton's resignation, Tilton and Jones had scheduled a meeting with Doug Adelberg ("Adelberg"), Vice President at Lovitt & Touche.  On November 16, 2011, Adelberg informed Jones that he had been contacted by Tilton the day before regarding his resignation from UHG.  According to Adelberg, Tilton expressed his desire to change the status between Lovitt & Touche and Aetna and stated that the two should schedule a time to get together in the future.

47.   On November 17, 2011, UHG advised Tilton that by accepting employment with Aetna and assuming the position of General Manager and President, Mountain Region, he would violate certain post-employment contractual obligations owed to UHG.  Attached

LITTLER MENDELSON, P.C.
A PROFESSIONAL CORPORATION
Camelback Esplanade
2425 East Camelback Road
Suite 900
Phoenix, AZ  85016
602.474.3600

-17-

hereto as Exhibit I is a true and correct copy of the letter sent from UHG's counsel to Tilton on November 17, 2011.

48.     Tilton's counsel responded on November 21, 2011.  Attached hereto as Exhibit J is a true and correct copy of the letter sent from Tilton's counsel on November 21, 2011.

49.     On November 21, 2011, Jones had a conversation with Paul Zucharelli ("Zucharelli") of CBIZ, another broker with whom UHG conducts business.  Zucharelli informed Jones that Tilton had recruited Frank Bennedeto ("Bennedeto"), Vice President of Sales at CIGNA, to join Aetna.  CBIZ is a large broker for CIGNA, which in turn is also a direct competitor of UHG.  CBIZ apparently had been recruiting Bennedeto for weeks; however, Bennedeto had informed Zucharelli on November 14, 2011, that he rejected CBIZ's job offer because he had accepted an offer from Tilton to join Aetna for a significant amount of money, which he could not refuse.  After turning down the job offer from CBIZ, Bennedeto told Zucharelli that they should talk about increasing CBIZ's business with Aetna.

## COUNT I

### (Breach of Contract)

50.     UHG realleges and incorporates the allegations contained in Paragraphs 1 through 49 as though fully set forth herein.

51.     Each Equity Grant is a valid and enforceable contract.

52.     UHG has performed fully each and every duty and obligation it agreed to and owed Tilton under the Equity Grants.

53.     The post-employment activity restrictions contained in Tilton's Equity Grants are reasonable in both scope and duration, and are necessary to protect UHG's legitimate protectable interests in its confidential business information and other legitimate business interests.

54.     Tilton's acceptance of a position with Aetna, misappropriation of UHG's confidential and proprietary information, and solicitation of brokers constitute a breach, present and imminent, of the Restrictive Covenants provision of the Equity Grants.

LITTLER MENDELSON, P.C.
A PROFESSIONAL CORPORATION
Camelback Esplanade
2425 East Camelback Road
Suite 900
Phoenix, AZ  85016
602.474.3600

-18-

55.    UHG is entitled to recover compensatory damages from Tilton for this harm.

56.    UHG is entitled to its attorneys' fees and costs due to Tilton's breach of the Equity Grants.

57.    The terms of the Equity Grants also entitle UHG to injunctive relief based on Tilton's conduct.

58.    The scope of Restrictive Covenants is reasonable and necessary to protect UHG's legitimate protectable interests.

59.    UHG is without an adequate remedy at law if Tilton is allowed to continue to violate the Restrictive Covenants, and has and will suffer substantial and immediate irreparable harm without the benefit of immediate injunctive relief.

60.    UHG is likely to succeed on the merits of its claims.

61.    The balance of hardships favors UHG.

62.    A grant of injunctive relief will serve the public interest.

63.    Because of the substantial difficulty in calculating damages caused by past, present, and future breaches, UHG is entitled to preliminary and permanent injunctive relief, enjoining Tilton from such present and future conduct in violation of the Restrictive Covenants.

## COUNT II

### (Violation of the Arizona Uniform Trade Secrets Act)

64.    UHG realleges and incorporates the allegations contained in Paragraphs 1 through 63 as if fully set forth herein.

65.    Tilton is in possession of confidential and proprietary information of UHG, including but not limited to, marketing and pricing strategies and data, distribution strategies, contract rates, names of and relationships with brokers and customers, product information, and contents of price and contract negotiations known exclusively to UHG.

66.    The aforementioned data is confidential and proprietary information, and constitutes a trade secret under A.R.S. §§ 44-401, *et seq.* and the common law of Arizona.

67.    The aforementioned data is not generally known and cannot be readily

LITTLER MENDELSON, P.C.
A PROFESSIONAL CORPORATION
Camelback Esplanade
2425 East Camelback Road
Suite 900
Phoenix, AZ 85016
602.474.3600

-19-

1  ascertained by members of the general public or other companies in the managed healthcare
2  industry, thereby providing said data with independent economic value.

3      68.    UHG undertakes reasonable efforts to protect the secrecy of the
4  aforementioned data.

5      69.    Tilton was fully aware that the aforementioned data constituted "Confidential
6  Information" and/or trade secrets of UHG, which UHG shielded from its competitors,
7  including Aetna.

8      70.    Tilton's actions will lead to inevitable misappropriation of trade secrets
9  because he has acquired and will use confidential and trade secret information, the
10  knowledge of which will be improperly provided to Aetna, in violation of his obligations to
11  UHG under the Equity Grants and diverted for use in unfair competition activities against
12  UHG, and will unfairly confer an economic benefit to Aetna.

13      71.    Tilton's misappropriation of trade secrets and other confidential information
14  has and will cause serious harm and damage to UHG in the loss of business and opportunity,
15  competitive advantage in the industry, and customer or brokerage business and/or
16  relationships.

17      72.    Upon information and belief, Tilton accepted employment with a competitor
18  under circumstances in which he will disclose this confidential information to and for the
19  benefit of himself and his new employer.

20      73.    Tilton's acts and conduct constitute a violation and threatened violation of the
21  Arizona Uniform Trade Secrets Act, and the misappropriation of trade secrets was willful,
22  malicious, and in reckless disregard of the adverse consequences to UHG.

23      74.    As a result of the intentional and wrongful conduct of Tilton, UHG has been
24  injured, for which it is entitled to injunctive relief and monetary damages against Tilton
25  together with punitive damages, attorneys' fees and costs in an amount to be proven at trial.

26  **COUNT III**

27  (Breach of Implied Covenant of Good Faith and Fair Dealing)

28      75.    UHG realleges and incorporates the allegations contained in Paragraphs 1

LITTLER MENDELSON, P.C.
A PROFESSIONAL CORPORATION
Camelback Esplanade
2425 East Camelback Road
Suite 900
Phoenix, AZ 85016
602.474.3600

-20-

1 │ through 74 as if fully set forth herein.

2 │        76.    A covenant of good faith and fair dealing is implied in every contract.  Such a

3 │ covenant requires that no party to an agreement do anything that would injure the rights of

4 │ any other party to receive the benefits of the agreement, and also requires each party to act

5 │ with fairness and good faith towards each other.  The covenant further requires that each

6 │ party to the agreement refrain from committing any acts or omissions that would cause injury

7 │ to the other parties to the agreement or deprive them from receiving the benefits of the

8 │ agreement.

9 │        77.    Each of the Equity Grants contained an implied covenant of good faith and fair

10 │ dealing.  Pursuant to this covenant, Tilton was obligated to act in good faith and to conform

11 │ with all of the requirements, including the Restrictive Covenants contained therein.

12 │        78.    Tilton breached the covenant of good faith and fair dealing by, among other

13 │ things, misappropriating UHG's confidential and proprietary information.

14 │        79.    As a result of Tilton's breach, UHG has and will suffer damages in an amount

15 │ which is not presently ascertainable.  UHG has been irreparably injured, and it continues to

16 │ face irreparable injury.  UHG is threatened with losing the value of its confidential and

17 │ proprietary information, along with business and goodwill, for which a remedy at law is

18 │ inadequate.

19 │ **COUNT IV**

20 │ (Breach of Duty of Loyalty)

21 │        80.    UHG realleges and incorporates the allegations contained in Paragraphs 1

22 │ through 79 as if fully set forth herein.

23 │        81.    As part of his employment relationship with UHG under common law, Tilton

24 │ owed UHG a duty of loyalty while in its employ.

25 │        82.    Upon information and belief, Tilton violated this duty of loyalty by a variety of

26 │ actions including, but not limited to, (1) making preparations to solicit brokers with whom

27 │ UHG had a relationship while still an employee of UHG; (2) unlawfully converting and

28 │ otherwise misappropriating for his own use and benefit the confidential, proprietary, and

LITTLER MENDELSON, P.C.
A Professional Corporation
Camelback Esplanade
2425 East Camelback Road
Suite 900
Phoenix, AZ  85016
602.474.3600

-21-

trade secret information belonging to UHG; (3) by soliciting employees from other entities for hire at Aetna while employed at UHG; and (4) making arrangements to violate his contractual obligations to UHG.

83. As a consequence of Tilton's actions, UHG's professional reputation, goodwill, and business relationships with its customers and brokers, and its ability to gain business and continue to effectively compete, has been severely and irrevocably harmed. In addition, Tilton's actions may have also caused UHG economic harm in the form of loss of the value of its business, lost revenue and other monetary damages in a presently undeterminable amount.

84. Tilton's conduct as set forth above is malicious and outrageous and done with reckless indifference to the interests of UHG so as to warrant an award of punitive damages.

## COUNT V

### (Unfair Competition)

85. UHG realleges and incorporates the allegations contained in Paragraphs 1 through 84 as if fully set forth herein.

86. Throughout his relationship with UHG, Tilton gained access to critically important, unique and valuable confidential, proprietary and trade secret information.

87. This information was never available to UHG's competitors or to the public at large, and Tilton would not have had access to such information but for his relationship with UHG.

88. UHG is informed and believes that Tilton retained and/or copied files and other confidential business information of UHG and is using such information to obtain for himself the business opportunities and competitive advantage that belong to UHG.

89. Through the conduct described above, including the misappropriation of UHG's trade secrets and confidential information and soliciting brokers with whom Tilton had worked with at UHG, Tilton's actions have fallen below the minimum standard of fair play and dealing acceptable in the commercial arena, and, consequently constitute unfair competition.

LITTLER MENDELSON, P.C.
A PROFESSIONAL CORPORATION
Camelback Esplanade
2425 East Camelback Road
Suite 900
Phoenix, AZ 85016
602.474.3600

-22-

90.    By accepting the position as Aetna's General Manager and President, Mountain Region, Tilton is enjoying and/or will enjoy the benefits of his unfair competition.

91.    By reasons of Tilton's acts of unfair competition, UHG has sustained, and will sustain, loss of the value of its business, losses of revenue and other monetary damages in a presently undeterminable amount.

## INJUNCTIVE RELIEF

92.    UHG realleges and incorporates the allegations contained in Paragraphs 1 through 91 as though fully set forth herein.

93.    By virtue of Tilton's actions, UHG has suffered and continue to face immediate and irreparable injury.

94.    The terms of the Equity Grants entitle UHG to injunctive relief based on Tilton's conduct.

95.    Upon information and belief, unless enjoined by this Court, Tilton will continue to engage in activities that breach the provision of the Equity Grants.

96.    The harm UHG faces should injunctive relief be denied is far greater than the impact upon Tilton of the implementation of injunctive relief, which would merely enjoin him from breaching the contractual obligations he owes to UHG, and his statutory obligations to maintain the confidentiality of his former employer's confidential information.

97.    UHG has no adequate remedy at law, and will suffer substantial and immediate irreparable harm unless Tilton is enjoined as requested.

98.    UHG is likely to succeed on the merits of its claims.

99.    The balance of hardships favors UHG.

100.   A grant of injunctive relief will serve the public interest.

101.   Because of the substantial difficulty in calculating damages caused by past, present, and future breaches, UHG is entitled to preliminary and permanent injunctive relief, enjoining Tilton from such present and future conduct in violation of his obligations and duties to UHG.

LITTLER MENDELSON, P.C.
A PROFESSIONAL CORPORATION
Camelback Esplanade
2425 East Camelback Road
Suite 900
Phoenix, AZ 85016
602.474.3600

-23-

1    **Jury Trial Requested**

2    UHG hereby requests a trial by jury.

3    **Prayer for Relief**

4    WHEREFORE, UHG requests judgment as follows:

5    A.    For a Temporary Restraining Order and preliminary and permanent

6    injunctive relief;

7    B.    Requiring immediate and expedited discovery to allow UHG to

8    ascertain the full extent of Tilton's violations of his obligations and the extent of damages he

9    has caused UHG to suffer;

10    C.    For compensatory damages;

11    D.    For such damages as the Court may deem just and equitable;

12    E.    For UHG's reasonable attorneys' fees expended in the prosecution of

13    this action pursuant to A.R.S. § 12-341.01;

14    F.    For costs incurred in prosecuting this action;

15    G.    For statutory interest at the highest rate allowed by law, on all sums

16    awarded from the date of judgment until paid; and

17    H.    For such other and further relief as the Court deems just and proper.

18    DATED this 5th day of December, 2011

19

20

21    *s/ Mark Ogden*
      Mark Ogden
22    LITTLER MENDELSON, P.C.
      Attorneys for Plaintiff
23    UnitedHealth Group Incorporated

24

25

26    Firmwide:105450009.4 047515.1065

27

28

LITTLER MENDELSON, P.C.
A PROFESSIONAL CORPORATION
Camelback Esplanade
2425 East Camelback Road
Suite 900
Phoenix, AZ 85016
602.474.3600